Robinson and
Hartshorne
v.
The United In-
surance Com-
pany.

and interest of the appellant's note, and his costs, to which I
think him well entitled. The decree ought to be affirmed
with costs. I cannot think, however appearances may be,
that the respondent, or his counsel, considered the points,
now decided, as necessarily, or absolutely adjudged on the
former appeal; and I am, therefore, disinclined to allow any
thing beyond the taxable costs.

It was, thereupon, ORDERED, ADJUDGED and DECREED,
that the decree of the court of chancery complained of, be
*affirmed*, and that the appellant pay to the respondent, his
costs, to be taxed, and that the record be remitted.

Judgment of affirmance.

William J. Robinson, and } Plaintiffs in Error,
William Hartshorne,

*against*

The United Insurance } Defendants in Error.
company,

Goods were
insured from
*New-York* to
*Cadiz, St. Lucar*
or *Malaga*, and
were consigned
to the master,
with directions,
in case of acci-
dent, to send
bills of lading
to the corres-
pondents of the
insured at those
places. During

THE defendants in error brought an action of *trover*
in the *supreme court*, against the plaintiffs in error, to re-
cover the value of certain wines and brandies, which the
defendants in error alleged to be their property. The
plaintiffs in error pleaded not guilty. The cause was tri-
ed at a circuit court, in the city of *New-York*, on the 10th
day of *January*, 1803, when the jury found a special
verdict, in which the following facts are stated : The de-
fendants in error, underwrote two policies of insurance,
for $10,000, on goods shipped by the plaintiffs in error,

the voyage, the vessel was captured by a French privateer, and carried into *Malaga*,
and was there condemned by the *French consulate*, as good and lawful prize. The pro-
perty was abandoned to the insurers, who accepted the abandonment, and paid as for
a total loss. The correspondents of the insured, at *Malaga*, at the request of the
master, who did not know of the insurance, and without any instructions to that
purpose, purchased the cargo of the captors, by means of a broker, and sold it, and af-
ter reimbursing themselves for the money advanced, invested the residue in a cargo of
wine and brandy, which was shipped in the vessel for the account and risk of the assu-
red, who received, and sold the articles. In an action of *trover* brought by the insu-
rers against the insured, to recover the amount of the goods thus received and sold, it
was held, that a purchase of property insured, by the agent or correspondent of the as-
sured, is for the benefit of the owner, or insurer, after abandonment and payment, if
he choose to affirm the purchase, and if the proceeds of such purchase and a subsequent
sale, are invested in other goods. they become the property of the insurer also, for
which he may maintain *trover*, if he elect to confirm the acts of the agent.

at, and from *New-York* to *Cadiz*, *St. Lucar*, or *Malaga*. The vessel and cargo were both owned by the plantiffs in error, and were conditionally consigned to the master; if he arrived, with the vessel and cargo, safely at *Cadiz*, he was either to transact the business himself, or to employ, for that purpose, such persons as he chose. In case of any accident, the master was instructed to inclose bills of lading to *O'Conner* of *Cadiz*, or *St. Lucar*, and to the house of *Grevigne* & *Co.* at *Malaga*, directing them to follow the instructions of the master. On the arrival of the vessel off *Cadiz*, she was boarded by an English vessel of war, and ordered not to attempt to enter that port; upon which, the master, agreeable to his instructions, steered for *Malaga*. On arriving in sight of *Malaga*, the vessel and cargo were captured by a French privateer, and carried into *Malaga*, where both vessel and cargo were condemned, by the French consulate at that place, as lawful prize. The vessel being in a leaky condition, (the captors having neglected to pump her) it was apprehended, both by the owners of the privateer, and the master, that the cargo, which consisted of sugar and cocoa, was damaged. Under this apprehension, after the condemnation of the vessel and cargo, without opening the hatches, the house of *Grevigne* & *Co.* to whom the master had applied and communicated his instructions, purchased the vessel and cargo from the captors, by means of a sworn broker, for the sum of $15,565, which sum, *Grevigne* & *Co.* advanced before the vessel and cargo were delivered to them by the captors, and before the state of the cargo was known. The purchase was made by *Grevigne* & *Co.* with the privity and advice of the master, who understood, at the time, that it was made for the benefit, and on account of the plaintiffs in error, and whomsoever else it might concern, and with a view of serving the plaintiffs in error. *Grevigne* & *Co.* had not any interest or concern in the purchase, but

ALBANY,
Feb. 1806.

Robinson and
Hartshorne
v.
The United Insurance Company.

ALBANY,
Feb. 1806.

Robinson and
Hartshorne
v.
The United In-
surance Com-
pany.

considered themselves as agents, and acting for the plain-tiffs in error. *Grevigne* & *Co.* accordingly sent an ac-count of the transaction to the plaintiffs in error ; and, in case any loss had occurred on the purchase, *Grevigne* & *Co.* as they supposed, would have had recourse for the same, against the plaintiffs in error. The cargo was afterwards sold by *Grevigne* & *Co.* and the nett proceeds of the sales thereof, amounted to the sum of $30,174 and 33 cents : out of which, *Grevigne* & *Co.* retained $15,555, to reimburse themselves for the sum paid to the captors, for the vessel and cargo, and $9,461, part of the balance, was invested in brandy and wines, which were shipped at *Malaga*, on board the same vessel, by *Gre-vigne* & *Co.* for account of the plaintiffs in error, and consigned to them at *New-York*, where the same were de-livered by the master to the plaintiffs in error. The resi-due of the balance remaining in the hands of *Grevigne* & *Co.* was afterwards invested by them in wines, which were afterwards shipped for account of the plaintiffs in error, and delivered to them in *New-York*. The brandy and wines were sold in *New-York* by the plaintiffs in error, and produced a profit of $3,611, 57 cts. including interest. As soon as the plaintiffs in error received notice of the cap-ture, and before any notice of the said purchase, they abandoned their interest in the goods and merchandise in-sured, to the defendants in error, who accepted the same, and paid the plaintiffs in error, as for a total loss. The cause was argued in the supreme court, on the special ver-dict, and a judgment given for the plaintiffs below ;* on which judgment, a writ of error was brought into this court.

*Hoffman*, for the plaintiffs in error. Here was a total loss of the property, by the capture and subsequent con-demnation.† The captors had a right to sell, and the as-sured, or their agent, had a right to purchase *bona fide.* Any collusion between the captors and *Grevigne* & *Co.* is not pretended. A fraud in the purchase, would, no doubt, render the sale void. *Grevigne* & *Co.* had no

* See 2 *Caines*,
0, for the rea-
ns of the
court.

† *Abbot* 9, 10.

motive to act collusively or fraudulently. They entered into the agreement of purchase with the captors *bona fide*, for the benefit of the assured, and made use of their own funds for the purpose. It was a purchase made at the risk of the assured, or of *Grevigne* & *Co.* The sale was regular and in the usual way ; though not at public auction, it was made by *sworn brokers*, in the manner practised in many of the commercial countries of Europe. By the condemnation and sale, therefore, the property was completely divested from the original owner, and transferred to the purchaser, who has the absolute benefit of the purchase. It happened that the goods were sold for a profit. Suppose, however, that there had been a loss on the speculation, would the defendants in error have been willing, or were they bound to bear the loss ? It would be unjust to give the assurer a right to elect in such a case, and take all the benefit of such purchase, without being liable for its loss ; to wait until they ascertained whether the purchase was profitable or not, and to receive he gain, but avoid the loss. The assurers made no election, nor did they pretend to claim the benefit of the purchase, until after the goods arrived at *New-York*. It is an universal principle that those who share in the profit, must also share the loss. But all responsibility of the assurers, in case of a loss, is denied on their part. On what ground of equity or justice, then, can they claim the profit ?

But, it will be said, the assured were the agents of the assurers. How are they agents ? It is not enough, to say they are so generally : it must be shown, that they were so in this particular transaction. The clause in the policy, only constitutes the insured agents, as to the safety and preservation of the property insured. After a loss, that agency is at an end. They cannot enter into new contracts and speculations, for the insurers. If the assured are the agents of the assurers in this transaction, the principals are bound by the acts of their agents, and the pro-

ALBANY,
Feb. 1806.

Robinson and
Hartshorne
v.
The United Insurance Company.

ALBANY,
Feb. 1806.

Robinson and
Hartshorne
v.
The United In-
surance Com-
pany.

perty purchased, must have remained at their risk ; but this is denied by the defendants in error, nor is it admitted by the supreme court, in giving their judgment in this cause.

Admitting, however, that the plaintiffs in error, were agents to the defendants in error, and liable to account, it cannot be in the form of action, which they have thought proper to adopt.    The action of *trover* will not lie in such a case.    This is not a mere objection as to form ; for the measure of damages may be very different, in the different actions of trover, trespass on the case, or assumpsit. The objection is important and decisive, against the recovery of the defendants in error, in their present suit. The action of *trover* is founded on property.    There must be a property in the plaintiffs.*    All the interest which the assurers could have in the property assured, ceased at *Malaga*.    They were entire strangers to the return cargo from *Malaga* to *New-York* ; it was not at their risk.

* 3 *Blk*. Com.
152, 158.

The contract of insurance, is no more than a contract of indemnity, for the voyage insured.    It cannot be extended beyond the termination of the voyage.    The insured, considered as agents of the insurers, under the clause in the policy, can be liable only for the salvage at *Malaga*, where the amount saved, of the property insured, was to be estimated and settled.    The salvage must be the rule for estimating the average.†    After the purchase, the assured might dispose of the goods at their pleasure, and invest the proceeds in other property, for their own account.    If a factor should sell goods of his principal, *bona fide*, and should, afterwards, invest the proceeds in other goods, on a speculation of his own, he can be accountable, only, for the proceeds of the first sale.    The principal cannot be entitled to the profits of every subsequent purchase and sale, which the factor may think proper to make with the funds in his hands.

† *Dacosta v.
Newnham*,
2 Term, 407.

*Riggs* and *Harison*, for the defendants in error.    It appears, from the master's evidence, that *Grevigne* &

*Co.* purchased the goods for the plaintiffs in error, and *whomsoever else it might concern.* It is immaterial, however, for whom they intended to act, for in judgment of law, they must be considered as acting for all concerned. In every case of an agent abroad, who acts from necessity, and without a knowledge of the contract of insurance, he will, of course act for the owners ; either the original owners at the time, or for those who have become owners by the subsequent cession and abandonment of the property. The right of abandonment, in this case,* is not denied. The effect of it, when accepted, is to transfer the property as fully, and as effectually, as a bargain and sale.† It is then, irrevocable, except by mutual consent.‡ This abandonment is a voluntary act of the assured, and generally made for his own be efit; for it seldom happens, that the insurer gets more than a wreck, a remnant of property. If, after the abandonment is accepted, and the money paid, the subject insured be released, the insurer cannot compel the assured to refund the money ; but must stand in the place of the assured.§ This transfer is retrospective, as well as prospective. The insurer takes the property as it was at the time of the loss ; and is entitled to all the benefits derived from it, and all the profits of the voyage.¶ The insured is entitled to nothing but the amount insured. Every subsequent benefit or compensation arising out of the property, belongs to the insurer. A consequence of this doctrine is, that the agents of the insured in relation to the property, become the agents of the insurer, and all their acts, if they choose to adopt them, enure to their benefit. Was the condemnation at *Malaga,* such as to give the assured, or their agents, a right to purchase on their own account, and was the property of the original owners divested ? It was a condemnation by the French consulate in a neutral port.* Even admitting the condemnation to have been legal, the sale was not made by an order of court, and was, therefore, irregular.

ALBANY,
Feb. 1806.

Robinson and
Hartshorne
v.
The United In-
surance Com-
pany.

* *Marshall,*
483.

† *Marshall,*
525.
‡ *ibid,* 519.

§ *Marshall,*
485, 524. *Bur-
rows,* 1966.

¶ *Marshall,*
519, 522, 525.
*Le. Guidon,* ch.
7 art. 12.
1 *Vesey,* 98, 99.
*Randall* v. *Co-
chran.*

* This question
is so fully dis-
cussed and so
well settled in
the case of
*Wheelwright* v.
*Depeyster,* ante,
p. 471, that it
is unnecessary
to repeat the ar-
guments and
authorities ci-
ted by the coun-
sel here.

ALBANY,
Feb 1806.

Robinson and
Hartshorne
v.
The United In-
surance Com-
pany.

* 2 *Douglas,*
649. 8 *Term,*
269. *Havilock*
v. *Rockwood.*

† 1 *Espinasse's*
*Cases,* 237.

‡ 1 *Caines,* 297,
*in note, and see*
2 *Caines,* 286.

§ 1 *Caines,* 292,
*and see* 2 *Caines,*
286.

This may be considered as analogous to the case of *ransom,* which is the paying of a certain sum of money, to redeem property taken by an enemy.* In case of an abandonment, after capture, and a subsequent ransom, the insurer may take the property, and pay the ransom. Or, if there be no abandonment, the owner keeps the goods, and the insurer pays the ransom, as a partial loss. The whole transaction at *Malaga,* is equivalent to a ransom. In the case of *M'Masters* v. *Shoolbred,*† Lord *Kenyon* decided that the master, who purchased the vessel, after capture, at public auction, was the agent of the owner, and there being no abandonment in that case, the insured recovered only for a partial loss, being the sum paid for the vessel and repairs. The vessel was sold as a *prize,* by the authority of the French consul at *Charleston,* and it is to be inferred, that there was a condemnation; yet the court considered it as analogous to a ransom. That there was no abandonment in that case, can make no difference, in the principle, which is perfectly applicable to the one now before the court. The case of *Saidler* and *Craig* v. *Church,*‡ was decided in this court, on the same principle. It is said, that the authority of that case is shaken by that of *Abbott* v. *Broome,*§ yet, if it be attentively examined, it will be found precisely analogous to the present. The master was considered as an agent *from necessity,* and for the owner. So if a factor who sends goods not ordered, the person to whom they are sent, becomes, from necessity, the agent of the owner, and may sell them for his account.

Then what are the reasons urged against the recovery of the defendants in error? It is said, there is no property in the plaintiffs below, to support an action of *trover.* This objection is now made for the first time; it was not suggested on the argument before the supreme court; and is, indeed, of no weight. By the abandonment, all the rights and incidents in regard to the subject were transferred to the insurers; *Grevigne* & *Co.* became substituted as their

agents, and their acts must *enure* to the benefit of the insurers. The purchase or ransom was an act relative to the property. For whom did *Grevigne* & *Co.* purchase, and invest the balance in goods ? For the *owners*, not for themselves. When the goods arrived at New-York, the insurers had a right to affirm the acts of their agents and take the property. If so, they may maintain *trover*. Had they given express orders to invest the proceeds, there could be no pretence for this objection. The affirmance or ratification of the acts of an agent, is equivalent to an original order. *Omnis ratihabitio mandato comparatur.*

Again, it is said, that the property was changed by the condemnation, and that the insured might purchase *bona fide* for his own account. This is begging the question. The insured or his agent must be considered as standing in the relation of *trustee* for the owners ; he, therefore, could not fairly purchase for his own account. An executor cannot purchase a debt due the estate of the testator, for his benefit. *Trustees, assignees,* or persons having a *confidential* character, are not allowed, from principles of justice and policy, to become purchasers ; but all their acts *enure* to the benefit of the *cestuy que trust.** In the case of *Plantamour* and others v. *Staples,*† the goods saved were sold, and the proceeds invested in other goods, by a correspondent of the assured ; and Lord *Mansfield,* considering this as being the best mode of sending home the proceeds, and for the benefit of all concerned, held these acts of the correspondent to be binding. But, suppose it otherwise, it does not follow that an agent who purchases at his own risk, shall, therefore, retain the property. In the case of an executor, or trustee, who purchases, if the purchase turn out bad, he cannot throw the loss on his *cestuy que trust.* A trustee may render the estate of the *cestuy que trust* better, but he cannot make it worse. This salutary principle, established as a safeguard to society, becomes more necessary in regard to agents in foreign countries, where the temptations to fraud are stronger, and the means of concealment greater. Will

ALBANY,
Feb. 1806.

Robinson and
Hartshorne
v.
The United Insurance Company.

* 8 *Vezey, jun.*
ex parte *James,*
845, 846.
† 1 *Term,* 611,
in *note:*

ALBANY,
Feb. 1806.

Robinson and
Hartshorne
v.
The United In-
surance Com-
pany.

this court sanction a contrary doctrine, by which owners of property would be bound hand and foot, and left to the mercy of foreign agents ?

That the property was sold by *sworn brokers*, cannot vary the case. That may be one of the modes of veiling a secret negociation between the captors and the agent of the assured. But, by the general principle, the agent purchases for the benefit of the parties concerned ; this renders all inquiry into the transaction unnecessary. No person can be a loser, who ought not to suffer.

*Radcliff* in reply. The purchase made by *Grevigne* & *Co.* was expressly for the assured ; they advanced the necessary funds for that purpose, on the credit and for the account of the assured. The words whomsoever else it might concern, in the testimony of the master, were words of course. It was, in truth, a purchase solely for the plaintiffs in error. If the defendants in error had a right to recover, it ought to be for no more than the sum insured, and not the whole amount of the goods. There may be other insurers on the same property, who are entitled to their share, besides the owners of the ship, and the residue of the cargo. The defendants in error, ought not to take the whole.

Admitting the doctrine, about the right of election, to be sound ; it ought not to exist for an indefinite period of time. The insurer should make his election within a reasonable period, and not wait until he ascertains whether the speculation is profitable or not. If not made in a reasonable time, it ought to be considered as waived.

The objection to the action of *trover*, in this case, is not merely formal ; yet if the form of action were erroneous, the judgment below ought to be reversed. If the insured were agents to the insurers they were liable as such ; and in an action for assumpsit, on an implied contract, they would be entitled to their commissions on the sale of the goods. But, by considering them as wrong doers, and bringing *trover* against them, they are deprived of any allowance for commissions. The only rule of damages, is the value of the goods at the time of the conversion.

The case of *Abbot* v. *Broome*, as well as that of *M'Masters* v. *Shoolbred*, arose on an insurance on the vessel, which stands on distinct grounds from an insurance on goods.    The object of the vessel is to carry freight, and return home.    Insurers have nothing to do with purchase or sale, with the rise or fall of markets, profit or loss.    As they are not to sustain a loss on account of markets or trading, it is no more than just that they should not receive a profit.

The doctrine of *election*, applies only to authorised agents in fact.    What right have the insurers to call on *Grevigne* & *Co.* as their agents ?    *Grevigne* & *Co.* might say to them, we do not know you, we acted for others.    If the right of election be admitted, it must necessarily involve the insurers in all the fluctuations of a market, and the consequences of trade.

The CHANCELLOR.    Three reasons have been assigned by the plaintiffs in error for the reversal of the judgment in this cause.

1. Because the defendants in error had no property in the wines and brandy shipped for *New-York.*

2. Because, after condemnation of the goods insured, the property became changed, and it was competent for the insured to purchase the same fairly, and without fraud ; and,

3. Because, *Grevigne* & *Co.* in this instance, purchased fairly, with *their own funds*, and at their *own risk*, or at the risk of the plaintiffs in error ; and in case of loss, in the bargain, neither *Grevigne* & *Co.* nor the plaintiffs in error, could ever have claimed any compensation, from the insurers, for such loss.

In the argument, on the first point, the plaintiffs in error have alleged, that the policy was on the cargo only ; that the purchase embraced both vessel and cargo, and that the damages having been given on the whole, the defendants have recovered beyond their right.

This, therefore, requires to be preliminarily examined ; for if the allegation can be sustained, as the damages are blended, and as there is no criterion to separate, or appor-

ALBANY,
Feb. 1806.

Robinson and Hartshorne
v.
The United Insurance Company.

4 I

ALBANY,
Feb. 1806.

Robinson and
Hartshorne
v.
The United In-
surance Com-
pany.

tion them, it would seem that gross injustice must, in that case, result from the judgment.

From the special verdict, it appears, that the vessel and cargo were purchased by *Grevigne* & *Co.* at $15,565 ; that the cargo was afterwards sold by them, and that the nett proceeds of such sale, amounted to $30,173 33 cts. out of which *Grevigne* & *Co.* retained the sum expended, in the purchase of the vessel and cargo, to reimburse themselves. Hence it is evident, that some portion of the production of the sale of the cargo, was applied to the purchase of the vessel, as the sum of $30,174 33 cts. was exclusively produced from the sale of the cargo, and with $15,565, both vessel and cargo were purchased. Of consequence, instead of blending both the vessel and cargo in the sale, they are clearly distinguished ; and, instead of the defendants in error, having recovered beyond their right, they have recovered so much less as the relative value of the vessel bore to the cargo. If so, it cannot consist with the allegation of the plaintiffs in error, that the judgment of the court below, is to their injury ; and it does not lie in their mouths to allege, that it is to the injury of the defendants. This ground, I have, therefore, no doubt, must fail.

All objections, originating solely in formal defects in the proceedings, will always be yielded to with a considerable degree of reluctance ; for if they are permitted to prevail, they compel the parties to run a new career, over the whole ground of litigation, to terminate, precisely, at the point at which they are stopped, before they can have their cause decided on the merits, in this court. I see, however, nothing in this case which requires the extension of indulgence, or an effort to surmount difficulties, arising from technical forms. To place the subject in a new point of light, it is only requisite to invert the order of examination, so as to discuss the merits before the rules, for testing the forms, are applied ; and on this inversion, it will be perceived, that the inquiry, as to the first objection, must be directed to the *gist* of the action.

The present case is rather of an uncommon complexion, in the history of insurance causes. Instead of presenting, as a question, which party should bear a positive loss, a decision which frequently excites sympathies, at variance with the inflexible duties of the judiciary, this court is merely called upon to decide, who is entitled to the profits of an adventure, relinquished by one party, as unprofitable, and by the other, submitted to, as an inevitable evil; but which ultimately proved beneficial, beyond the expectations of either.

ALBANY,
Feb. 1806.

Robinson and
Hartshorne
v.
The United Insurance Company.

This is, certainly, a favourable aspect for the decision of a general principle, which, as a leading case, will influence a decision on all similar cases in future.

The merits of this cause have been brought into view, in the discussion of the 2d and 3d points.

As to the second, I have, on a former occasion, been led to remark to this court, that from the nature of maritime adventures, much is unavoidably hazarded by the insurers, beyond the mere marine risks : Combinations, difficult to develope, and unfair speculations, at their expense, may often enlarge their reponsibilities, beyond the fair intent of their stipulations ; especially, as the contingencies to which the subjects insured are exposed, often place them in situations which the most comprehensive view of their probable occurrence, cannot always devise means to reach. Much must, therefore, depend upon the integrity of the persons, who may, either by express agency, in consequence of the appointment of the parties, or by occasional interposition for the benefit of either, intermeddle with those subjects. Hence, transactions relating to them, are tested by rules calculated to enjoin the observance of the purest good faith, and to repel every temptation which may excite improper motives, or a disposition, to sacrifice the interest of one of the parties concerned, in order to promote that of the other. Among those rules, none is better adapted to effect this salutary object, than the one which, disregarding the means by which the property insured is retained by the insured, holds it responsible in its application, to the mitigation of those losses, the indemnity against which, was the avowed and exclusive object of the policy.

ALBANY,
Feb. 1806.

Robinson and
Hartshorne
v.
The United In-
surance Com-
pany.

——————
* 3 *Burr.* 1209.

That arbitrary notions, concerning the change of property by capture, ought never to be the rule of decision, contrary to the real fact between insurer and insured, upon a contract of indemnity, was the doctrine of Lord *Mansfield*, whose opinion, particularly on the subject of insurances, is deservedly highly respected, so early as the year 1761, in the case of *Hamilton* v. *Mendez*.\* This doctrine has not been shaken by subsequent decisions. The opinion expressed by the court below, upon rendering judgment in this cause, I think, is conformable to this doctrine, and the reasoning on the occasion, so forcibly concludes to this point, as to satisfy my mind, that the judgment, on that reasoning, ought to be sustained.

As to the third point ; *Grevigne* & *Co.* acted in the purchase of the vessel and cargo, in concert with the captain, and by his advice. Letters had been addressed by the plaintiffs in error, to that house ; the former valued themselves on it, for some kind of aid or protection, in case of capture. To what extent they were intrusted, does not appear, and whether they acted, in compliance with instructions, or from their own impressions merely, is not disclosed ; nor is it material, as it appears, *that they acted for the benefit of the plaintiffs* in error. If this conduct was regulated by instructions, no doubt could possibly have been entertained on the subject. If they interposed, as volunteers, and without such instructions, they did so, at their peril. The plaintiffs in error might, in that case, have disaffirmed their acts, as agents. But if they affirmed them, they were, as a necessary consequence, adopted and sanctioned throughout, and the investment of the proceeds of the sale of the cargo in the wines and brandy, would have been as much an object of that affirmance, as the purchase ; for there is not the least pretence, that *Grevigne* & *Co.* have not acted with the utmost fairness throughout. They advanced the money to make the purchase, in the first instance, out of their own funds. But even this advance was connected with the subject insured ; and they did not make it as mere strangers, purchasing *at hazard*. The vessel and cargo carried a credit with them, in-

trinsically, to a certain extent. Their adviser in the purchase was the captain, perfectly acquainted with the species and quantity of the cargo, best qualified to make the requisite estimates of the probable effects, which the not pumping the vessel, after its capture, might produce on the cargo ; and they were acquainted with the state of the market which was at their door. All these circumstances gave them advantages in the purchase, which they enjoyed exclusively, and, in a degree, nearly equal to what others would have had, if the hatches of the vessel had been opened ; and all these advantages, the knowledge of the state of the market excepted, they possessed, in consequence of their acting in concert with the captain, the avowed agent of the plaintiffs in error. As soon as *Grevigne* & *Co.* had the cargo in their power, they sold it, deducted their advances from the proceeds of the sale, invested the surplus in wines and brandy, and remitted them to the plaintiffs in error, *for their benefit.* If it be necessary, after those facts are established, to resort to other evidence to show the intent of the purchase, the captain, it is found by the jury, understood it was made for the benefit, and on account of the plaintiffs in error, and whoever else it might concern.

These circumstances show, that the purchase was made for the benefit of the plaintiffs in error, and to mitigate their loss, and if that was the case, the whole interest of the plaintiffs having devolved upon the defendants, the purchase *enured* to their benefit. It is, therefore, necessary, briefly to advert to so much of the doctrine of abandonment, as may apply to the subject.

Whenever a loss accrues, which from circumstances, applying the rule of technical total loss, may, in the result, prove either partial or total, an abandonment becomes necessary, to consummate the right of the insured, to a total loss. The acceptance of the abandonment, by the insurer, and a consequent satisfaction of the policy, vests the property saved in the insurer, and, in its effect, has a relation to the event which produced the loss, though

ALBANY,
Feb. 1806.

Robinson and Hartshorne
v.
The United Insurance Company.

ALBANY,
Feb. 1806.

Robinson and
Hartshorne
v.
The United In-
surance Com-
pany.

necessarily modified by the subsequent circumstances, in which it may have been placed, in the intermediate time, between the loss and abandonment. A suspension of the acceptance, can have no other effect, than to enable the insurer, by possessing himself of the knowledge of all circumstances, to ascertain the extent of his liability on the policy, whether for a total or partial loss. If partial, the abandonment does not, of itself, conclude him; if total, he, as a legal consequence, succeeds to the right of the insured, as to the property saved, *cum onere.* The time of acceptance can, therefore, have no influence on the determination of this cause, as the adjustment of the policy, fixed the rights of the parties, by their voluntary and mutual acts, on the question of abandonment; and whatever part of the subject insured, was saved, became the property of the defendants in error, in the precise state it then was; for the plaintiffs have devolved all their right, subject to all its burthens, and the contingencies to which it was exposed, as well from management, as transmission, upon the defendants.

The wines and brandy, having been purchased with the proceeds of the cargo insured, and shipped by persons assuming to act as agents of the insured, if in their progress to the port of destination, they had been wholly destroyed, the loss, as between the insured and insurer, must have been borne by the latter; for, in that case, to what could the abandonment have attached? Not to the money which *Grevigne* & *Co.* had received for the cargo, for that they had parted with in the new investment; not to other property of the insured, for it had no connection with the subject insured. Though among the rights devolved upon them by the abandonment, was that of affirming or disaffirming the acts of *Grevigne* & *Co.* what beneficial purpose was to result to them, from a measure of that kind? If they affirmed the acts of *Grevigne* & *Co.* those acts had consigned it, in their effect, to destruction. If they disaffirmed, *Grevigne* & *Co.* would have held the property

as their own ; for a disaffirmance could not be partially exercised.

ALBANY,
Feb. 1806.

Robinson and
Hartshorne
v.
The United In-
surance Com-
pany.

This train of reasoning has convinced me, that the wines and brandy became the property of the defendants in error, by the abandonment. That the abandonment relating back to the event, occasioning the loss, included the investment in the wines and brandy ; that the profits were an inseparable incident of such investment, and that the defendants in error are entitled to them.

This doctrine does not expose insurers to the great risks represented to flow from it. Whatever is necessarily connected with the subject insured, and within the purview of the policy, they are bound, by its legal construction, to take the risk of ; but beyond that, their rights are effectually protected, by the power of affirming or disaffirming an agency in the concern.

I shall now recur to the objection, as to the form of the action. It is certain, that this action can only be sustained, by a person having either an absolute, or qualified property in the chattels for which it is brought. I have already given my reason for deciding that the defendants had a property in the wines and brandy ; if so, the sale operated as a conversion, but this point is waived by express consent.

It has been objected, that the property of the defendants in error, if they had any, was mixed with that of the plaintiffs, so as to be incapable of precise specification, and that *trover* will not lie by one person, holding in common with another, against such other. It cannot be useful to examine the law on this latter objection, until it is ascertained, that the fact to which it is intended to apply, exists.

The community of property relied on, is attempted to be inferred from those parts of the special verdict, which state, that the defendants in error underwrote two policies for $10,000, on *goods and merchandise*, on board of the *Apollo* ; that both vessel and cargo were owned by the

ALBANY,
Feb. 1806.

Robinson and
Hartshorne
v.
The United In-
surance Com-
pany

plaintiffs in error ; that both *vessel and cargo* were con-
demned, and afterwards purchased by *Grevigne* & *Co.*
that the *cargo* was afterwards sold for $30,174, 33 cts. and
that after reimbursing themselves, they invested the bal-
ance in wines and brandy, which were consigned to the
plaintiffs in error.   I have already adverted to the circum-
tance, that the $30,174, 33 cts. were the proceeds of the
cargo exclusively ;  there is no fact found, from which it
can be legally intended, that the cargo insured, was not
the whole embarked on board the vessel.   The difference
between the valuation in the policy, and the account of
sales, might have been produced by the different state of
the market, at the port of shipping, and that of discharge ;
this, from the ordinary fluctuation of markets, must be the
most uncertain of tests, and cannot operate to establish
the existence of any other parcel as composing the cargo,
than what was insured.

I am, for these reasons, of opinion, that the judgment
of the court below, ought to be affirmed.

WOODWORTH, Attorney-General.   This cause having
been decided in the supreme court, after solemn argu-
ment, in favour of the defendants in error, we are now
called upon to review that decision, and pronounce judg-
ment in the last resort.   I have considered attentively the
reasons assigned by the plaintiffs in error for reversing the
judgment of the supreme court,  and feel peculiar satisfac-
tion, that in a cause somewhat important, as it respects the
amount in controversy, but much more so, as it respects
a great principle in the law of insurance, I have no doubts
in my mind in deciding on the question before us.

The plaintiffs in error contend,

1. That the defendants in error have no property in the
wines and brandies shipped to New-York.

2. Because, after condemnation of the goods insured,
the property became changed, and it was competent for
the assured to purchase the same fairly and without fraud.

3. Because *Grevigne* & *Co.* purchased fairly with their own funds, and at their own risk, or at the risk of the plaintiffs in error, and in case of loss in the bargain, neither *Grevigne* & *Co.* nor the plaintiffs in error, could ever have claimed any compensation from the insurers for such loss.

I will briefly examine these positions, though not in the preceding order, inasmuch as the decision of the first point will depend very much on the opinion formed on the other two.

The plaintiffs in error abandoned, as soon as intelligence was received of the capture; the defendants in error accepted, and on the 5th day of *October*, 1799, paid as for a total loss. These being facts admitted by the special verdict, it becomes material to consider what consequences result from them, and what rights were thereby acquired by the insurers.

On accepting the abandonment and payment to the insured, the nature of the contract, as well as the settled law on this subject, put the insurer in the place of the insured, and all acts done by the agents of the latter, in relation to the property abandoned, *enured* to the benefit of the former. A contrary doctrine would change the policy from a contract of mere indemnity, and would permit the insured to speculate in the purchase of the property abandoned. This practice, the law has, in my opinion, wisely prohibited. The rule is calculated to prevent fraud, and materially to promote the interests of commerce, for the benefit of which, insurance was originally introduced. To apply this principle to the case under consideration; I consider that after the abandonment, the master, as well as *Grevigne* & *Co.* became the agents of the insurers, although, at the time of the purchase of the vessel and cargo at *Malaga*, and the subsequent investment of the proceeds in brandy and wines, they probably supposed that they were acting solely for the assured. Whatever might have been their impressions cannot be material, as they

ALBANY,
Feb, 1806.

Robinson and
Hartshorne
v.
The United Insurance Company.

Vol. I.　　　　　　4 K

cannot vary the law on this question. They had no knowledge of the abandonment, and therefore purchased for the benefit of the plaintiffs in error, and whomsoever else it might concern. The assurer being substituted by law in the place of the assured, was entitled, at his election, to the benefit of the contract made by *Grevigne* & *Co.* with the advice and consent of the master. But it is said, however correct this may be, as a general principle in the law of insurance, it cannot operate after a capture and condemnation ; for in that case, the property is changed, and a purchase made by the assured shall accrue to his benefit, because he is liable to all risk, and if a loss happens, or the speculation turns out unfavourably, it must be borne by him.

Now, though it be admitted, that after condemnation, the property becomes completely changed, and that a purchase made by a stranger would give him a good title against all the world ; yet I do not perceive that this will aid the plaintiffs in error ; for the ground of recovery against them is, that this purchase was made, not by a stranger, but by persons standing in the relation of agents to the assured, and for their benefit, as was believed at the time. If, then, the defendants in error, after abandonment and payment, acquired all the rights incident to the property, which the assured once had, it clearly follows that they had an absolute property in the cargo, from the time *Grevigne* & *Co.* purchased. The subsequent investment of a part of the proceeds in brandy and wine, by the same agents, and with a view to benefit the assured, was a continuation of the agency, and vested the property in the assurers at their election.

I do not find that any of the cases controvert this doctrine, or establish a principle, that after condemnation, the assured or his agents may purchase for their own benefit the property condemned, and that such purchase is considered on the same footing as if made by a stranger.

ALBANY,
Feb. 1806.

Robinson and
Hartshorne
v.
The United In-
surance Com-
pany.

'The case of *M·Masters* v. *Shoolbred*, (1 *Esp. Rep.* 237.) is in my mind an authority governing the present question. Until that be shaken by different decisions, the law may be considered as well settled. From this view of the subject, it is not material to examine the efficacy of a condemnation by the French consulate at *Malaga*, whether the vessel and cargo were sold under the authority of the court, or whether any thing was done by the captors, which could be deemed a disaffirmance of the condemnation.

If it be granted that *Grevigne* & *Co.* purchased at their own risk, or at the risk of the plaintiffs in error, and in case of loss in the bargain, neither could have ever claimed any compensation from the insurers for such loss ; this, in my opinion, is not material. It is irrelevant to the question under consideration, which depends on certain principles, defining the rights of the insured in a case circumstanced like the present, adopted with a view to prevent an insurance from becoming any thing more than a contract of indemnity, and to guard against frauds which would be difficult to detect, if a different rule were established.

There is not in my mind any hardship in this rule ; the master or agents are presumed to know the law, and must be sensible that no obligation is imposed on them to interfere or purchase the vessel or cargo. It is absolutely at their election to do so, and, consequently, they need not run any risk. It is not probable they would ever be disposed to embark in a doubtful speculation. Their conduct, in this respect, will ever be regulated by extreme prudence and caution. If a certain prospect of gain, by purchase present itself, the master or agent, acting with good faith, will avail himself of the advantage, believing that the insurer will ratify the contract, and if he does not, no loss will be sustained, for he is certain that the goods or vessel will yield a clear profit. *Grevigne* & *Co.* as well as the master, were satisfied of this when they purchased.

ALBANY,
Feb. 1806.

Robinson and
Hartshorne
v.
The United In-
surance Com-
pany.

The price given for the vessel and cargo, at *Malaga*, was $15,565, and the nett proceeds of the cargo at the same market, were $30,174 32 ; the agent, therefore, would justly have been exposed to censure, if, in so plain a case, he had not interfered to alleviate the loss of those concerned.

I subscribe to the correctness of the rule, that the insurers ought to decide, immediately after notice, whether they will avail themselves of the purchase made by the agent. I presume they did so in this case. It is admitted that there was a demand made on the plaintiffs in error, for the brandy and wines, and a refusal to deliver on their part ; and the special verdict states that they were sold in *New-York*, and netted $3,611 37. The vessel and cargo arrived at *New-York*, in *October*, 1799 ; the demand and refusal must have been shortly after, for it is stated, that the action of trover was commenced in the supreme court in the term of *January*, 1800. These premises will warrant the conclusion, that the insurer made his election promptly after notice of the re-purchase, particularly, as no proof was adduced by the assured to fix the time with certainty.

But it is contended, by the counsel for the plaintiffs in error, that in *trover* the plaintiff must have an absolute property in the chattels attempted to be recovered, and having failed in making out this, the defendants in error were not entitled to recover. That a general or special property is necessary, will not be denied ; and if the reasoning on this case be correct, it follows :

1. That the master and *Grevigne* & *Co.* were, by law, agents for the insurer, in the re-purchase of the vessel and cargo, notwithstanding the condemnation.

2. That being such agents, in judgment of law, they made the purchase for the benefit of the insurer.

3. That the proceeds of the cargo, or a part of them, having been invested by the same agents, in the wines and brandy, for the benefit of the concerned, who,

by law, are the defendants in error ; and the defend-
ants in error having elected to ratify the contract, they,
from that moment, had an absolute property in the goods,
and, consequently, could maintain trover.

4. The sale of the wines and brandy was a conversion ;
and on proof of the preceding facts, the insurers were en-
titled to a verdict. I do not perceive any difficulty in this
form of action, of allowing a defendant in mitigation of dam-
ages, any charges necessarily incurred respecting the pro-
perty for the recovery of which, an action of *trover* is insti-
tuted. It is therefore, immaterial to say, that no set-off is
admissible, when the same object is obtained under the
plea of not guilty.

From this examination of the cause, I am of opinion,
that the plaintiffs in the court below were entitled to reco-
ver, in the present form of action ; and, consequently, that
the judgment of the supreme court ought to be affirmed.

CLINTON, Senator ; after stating the facts in the case.
More importance appears to have been attached to this
cause, than can arise from any intrinsic difficulties attending
it. The effects of an abandonment and acceptance, in ordi-
nary cases, are not denied. The property abandoned, is
transferred to the insurer, and is as completely vested in
him, as if it had been the subject of a bill of sale. All the
benefits, therefore, derived, or derivable from this acquisi-
tion, must enure to him. The insured cedes to him all his
right, title, and interest in the subject insured, or in what may
be saved out of it. In regard to the insurer, the abandon-
ment has a retroactive effect, and he is considered as having
been proprietor of the thing insured, from the commence-
ment of the voyage. Though it generally happens that in-
surers are losers by accepting the abandonment, yet extra-
ordinary events do sometimes occur, by which they are
not only completely indemnified, for the amount they have
paid, but gain a profit ; as in case of the safe arrival of a
ship, after an abandonment for a total loss. So in case of a
capture, the insured, after an abandonment, if the vessel be

ALBANY,
Feb. 1806.

Robinson and
Hartshorne
v.
The United In-
surance Com-
pany.

ALBANY,
Feb. 1806.

Robinson and
Hartshorne
v.
The United In-
surance Com-
pany.

released, or recover her liberty, will have all the benefit of the adventure.

The case before the court is of this description. The cargo is abandoned on account of the capture, and the insurers pay the full amount insured. The cargo is purchased, by an agent or correspondent, from the captors, and sold, and after deducting the money advanced, the residue of the proceeds are invested in other goods, and remitted to New-York, to the supposed owners. It is said, that there are circumstances in this case, which distinguish it, from the effects of an ordinary abandonment. It is alleged, that there had been a condemnation of the property, and that the insured, as well as any other person, had a right to purchase on their own account. But the whole transaction clearly shows, that the purchase was made for the assured, without any knowledge of the insurance or abandonment. *Grevigne & Co.* acted as the agents of the owners. They purchased the cargo at a low price, and sold it at a high one. To induce the captors to sell at a low rate, the right of appeal was surrendered by the compromise. The right of appeal belonged to the insurers, after abandonment; and they ought not to be deprived of it, without receiving the benefits which may have resulted from the sacrifice.

The legality of the *consular tribunal* at *Malaga,* may well be doubted.* The sale in this case, was not made by the order of any court. It was a private bargain with the captors, who thought it, under all circumstances, an advantageous compromise for them. If the doctrine contended for, on the part of the plaintiffs in error, were to prevail, a wide door would be opened for fraud. If the assured be at liberty to divest himself of the trust he holds for the insurer, in case of any accident happening to the property insured, if the master can disembarrass himself of his implied agency for the persons concerned, and if the consignee may renounce his express agency for the assured, and, either of them may enter the market and purchase the property for his own benefit, it must be attended with great injury to the rights of the principal. If a condemnation so changes the property, as

* See *Wheelwright v. Depeyster,* ante, p. 471.

ALBANY,
Feb. 1806.

Robinson and
Hartshorne
v.
The United In-
surance Com-
ny.

to put an end to the obligations of trustees and agents, we have only to suppose the property uninsured, in order duly to estimate the pernicious consequences of such a doctrine. The captors will be induced to sell low, and the agent, upon whom the owner relies for the protection of his interests will be tempted to speculate, and to turn the loss of his principal to his own advantage. Considering, then, the insured, after an abandonment, as a trustee for the insurer, he is to be governed by the salutary principle, that forbids a trustee from becoming a purchaser, for his own benefit. If the insurer be substituted in the place of the original owner, the agents of the latter, become thereby the agents of the former. It is objected, that it is hard and inconvenient, that the insurers should not sustain a loss, arising from such a purchase and sale, and yet should be allowed to receive the gain, if it turn out profitable. But the negotiation in this case is either the result of the implied agency of the master of the ship, or of the express agency given to him and *Grevigne* & *Co.* If it proceeded from the former, then both the insured and insurer are bound by the acts of the master, who, from the nature of his office, is authorised to do whatever he shall deem most conducive to the interests of all concerned; if from the latter, then neither the insured nor insurer are bound by the acts of the agents. They acted at their peril; and the principal may affirm or disaffirm their acts, at his pleasure. If the speculation be beneficial, there is no doubt that the principal will ratify it. If it be disadvantageous, he must bear the loss occasioned by his negligence or misconduct. It is not probable, that an agent will act, *bona fide*, against the interest of his employers; and if he acts with good faith, it can rarely happen that his conduct will not be approved.

If these principles be just, the objection to the form of action is of no avail; for, by the abandonment, all the property and its incidents were transferred to the insurers. It remained vested in them, until they made their election to disaffirm the purchase, and subsequent investment. For these

ALBANY,
Feb. 1806.

The New-York
Ins. Company
v.
William I. Robinson.

reasons, I am of opinion, that the judgment of the supreme court ought to be affirmed.

The majority of the court being of the same opinion ; It was, thereupon, ORDERED and ADJUDGED, that the judgment given in the supreme court be affirmed, with double costs, and damages, and that the record be remitted, &c.

Judgment of affirmance.

*S. C.*
*2. Caines, 357.*

The New-York Insurance company,

against

William I. Robinson,

}  Plaintiffs in Error,

}  Defendant in Error.

The owners of a ship and cargo, agreed with *R.* who was to go as supercargo, on a voyage out, and home, to pay him a gross sum out of the proceeds of the return cargo, or to give him goods out of it to the amount, at his election, and in consideration of which, *R.* and his partner engaged to sell the return cargo free of commissions. On her homeward voyage from *Batavia* to *N. York,* the vessel was compelled by stress of weather, to put

THE defendant in error brought an action against the plaintiffs in error, in the supreme court, on two policies of insurance. The policies were open, and the insurance was declared to be " upon the interest of *William I. Robinson,* being the allowance made with him as supercargo, as per agreement with the owners of the ship Mary."

On the trial of the cause, the jury found a special verdict, which contained the following facts. The plaintiff being part owner of the ship Mary, and her cargo, contracted with the other owners, to go in the ship, on her voyage to the *East-Indies,* as supercargo, on the terms specified in the following agreement. " We, the subscribers, owners of the ship Mary, having engaged *William* " *I. Robinson,* as supercargo, on her intended voyage, from " hence to *Batavia,* and possibly to *Canton,* have agreed, " in consideration of his undertaking and executing " the duties of that trust, to pay to him, £10,000, out " of the proceeds of any cargo the ship may bring from *Ba*-

into *St. Kitts,* where the cargo was sold from necessity, by merchants there, on commission ; part of the proceeds were vested in other articles, the produce of the island, and brought to *New-York,* *R.* having effected a policy of insurance, on his commissions, as stipulated in his contract with the owners, on their refusal to pay him, he abandoned as for a total loss, and brought his action against the insurers, to recover the amount ; and it was held, that as the return cargo did not arrive at *New-York,* *R.* lost his commissions, and was, therefore, entitled to recover the amount of the insurers.