Davis, J.,
delivered the opinion of the court:
The defendants demur generally in these cases «upon the ground that the petitions do not state facts sufficient to constitute a cause of action, and they also move to strike out certain *436 evidence as inadmissible. The argument, which was very-general in its nature, has proceeded upon the understanding that the details of each case are to be considered at a later stage of the proceedings. It is unusual for general principles to be presented in a particular case when the case itself is not to abide the result reached by the court; yet, in view of the novelty of these claims, their age, their number, the peculiar jurisdiction conferred by the remedial statute, and in view of the importance to counsel of some light from the court in aid of the novel responsibilities cast upon them, we think it our duty to somewhat overstep the usual forms of judicial procedure in support of substantial right and justice.
Three eases are presented together — one on behalf of the owners of the schooner Delight, the other two on behalf of the insurer of the vessel and cargo.
The demurrer applies to all of these. Taking the petition of the owner’s administrator as a model upon which to discuss the general question of form, we find it alleges the Delight to have been a duly registered vessel of the United States; that the claimant is, and his intestate was, a citizen of the United States; that the schooner sailed from Boston for Saint Bartholomew’s, and during the prosecution of her voyage was “ illegally captured on or about the 19th day of July, 1799, by a French privateer called the Oourageuse,” and, with her cargo, condemned as a prize at Guadeloupe by a French tribunal, in violation of the law of nations and the treaties between the United States and France.
In considering the demurrer to this petition it must be remembered that we are not here to enter judgment under this act, but to fid vise Congress; to report to that body our conclusions of fact and law. In performance of this duty we do not feel authorized to throw a case out of court because of some technical defect in form not going to the merits, and which may be remedied without injury to the defendants.
It is urged that the use of the word “illegally” before the word “ captured” is bad pleading, as involving a conclusion of law. This point may be passed with the observation that, in our opinion, the word is at most mere surplusage. The averment that the vessel was seized by a French privateer during a commercial voyage, at a date when, as we have heretofore held, this nation was at peace with France, and that she was *437 afterwards condemned, is sufficient allegation of illegality in the capture.
We are not quite so clear about the averment of place of seizure, which it is urged should affirmatively appear as upon the high seas, and at this early stage do not think it advisable to announce any opinion as to the presumption contended for by the claimants that a vessel prosecuting a voyage across the ocean, and seized during that voyage, is seized upon the high seas.
Should future argument show this point to be important, the claimant will have leave to amend in accordance with the facts developed. We conclude the petition to be sufficient in form, and the argument made for the defense as to the validity of claims of this class against France and their assumption by the United States having been fully considered in the case of William Gray, administrator, decided after the argument of the case at bar, we overrule the demurrer upon these points.
There remain to be considered in this connection the position and rights of insurers. One of the petitions alleges that Brooks, as agent of underwriters, insured the Delight against loss “ from dangers of the sea, tires, enemies, pirates, assailing thieves, restraints, and detainments of all kings, princes, and people of what nation and quality soever, barratry of the master, and of the mariner and all other losses and misfortunes that have or shall come” to the vessel, and alleges further that insurance' was paid after capture; that said Brooks repaid to each underwriter the amount underwritten by him, receiving in return an assignment of all the interest of such underwriter.
The other important allegations, such as those concerning ownership and condemnation, are substantially the same as in the owner’s petition.
The only interest the Government appears to have in a question of this kind is, that there shall not be a double payment or an overpayment on account of any one loss, so that in effect we have but to solve the rights of the owners and insurers as between themselves, which are determined by principles of insurance law already well settled by the courts.
Insurance is a contract whose object is indemnity, for which the consideration received by the insurer is twofold; first, his *438 premium; second, Ms hope of recovery, should a loss occur, his pes recuperandi.
This hope caunot exist unless there is a reasonable prospect of some recovery. It cannot exist where a vessel has sunk at sea, but it does exist where a vessel is simply stranded but not become a total wreck, “ where any part of the property exists in specie, * * * as when the vessel is stranded and still alive.” Where something may be possibly saved, the owner claiming' absolute loss must “abandon” to the insurer, relinquishing- thereby all his rights to any possible future recovery from the thing insured. Abandonment is always based upon the existence of some hope of recovery, and where the hope does not exist it is an unnecessary form.
When abandonment is made and the insurance paid the insurer stands in the place of the insured, and is entitled to all the advantages resulting from that situation, and this right relates back to the loss. (Park on Ins., 143; 1 Wash. C. C., 443; 12 Peters, 378; 1 Sumner, 328 and 400; Phillips on Ins., 1707; 2 Parsons on Mar. Ins., 194; 104 Mass., 107; 12 Pick., 348.)
“ When a total loss has been paid there passes to the insurer not only what remains of the ship in a material form, but likewise all rights incident to the property of whatever kind. When a loss of any kind, whether total or partial, has been paid the insurer so far stands in the place of the assured that he is entitled to recover whatever compensation for the loss the assured may be able to recover from any third party.” (Lowndes Mar. Ins., 223; Phillips on Ins., § § 1712 and 1723.)
The Supreme Court supports this doctrine, saying it is a mistake to assert that the right of a marine insurer to proceed against a carrier after payment of total loss “ grows wholly or even principally out of any abandonment; payment of a total loss without abandonment being sufficient to vest in the insurer the rights of the insured ” (Hall and Long v. Railroad Co., 13 Wall., 367); while Phillips states the rule to be that “a mere payment of a loss, whether partial or total, gives the insurers an equitable title to what may be afterwards recovered from other parties on account of the loss. The effect of a payment of a loss is equivalent in this respect to that of an abandonment.” (§ 1723.)
In capture and condemnation there can be no spes recuper-andi, for the vessel, so far as the owners are concerned, has *439 disappeared, and there exists no reasonable prospect that anything will at any time be recovered. “There is no existing hope,” to use Chancellor Kent’s language, “ of recovery in this case [of capture], * * * and an abandonment * * * would have been as idle as if the property had perished at sea” (Gracie v. The N. Y. Ins. Co., 8 Johnson, 245); and since the time of Lord Mansfield the capture of a neutral merchantman upon the high seas, especially when followed by confiscation, amounts to total loss and abandonment. (Goss v. Withers, 2 Burr., 683; 4 Crunch, 29; 4 Dallas, 421; 3 Wheat. 183; 1 Wash. C. C., 145; 3 Mass., 238.)
In the case of the Vermont, in which the opinion already cited was delivered by Chancellor Kent, the vessel had been captured, the capture declared illegal by the French tribunal; pending an appeal by the captors, the cargo was delivered to the consignee upon bond given by them larger in amount than the insurance. The appeal was heard and the vessel with her cargo condemned, whereupon the insured sued upon the policy after expressly refusing to abandon. The court, holding abandonment to be unnecessary, shows that any claim against the captors could only be prosecuted by the National Government, which, if compensation were obtained, would become trustee for the-party having the equitable title to the reimbursement, and that this party is the insurance company, “ if they should pay the amount of the.bond;” that is, the insurer would be entitled to what he paid. This is in accordance with the general doctrine of insurance law laid down by Lord Oockburn in the following language:
“I take it to be clearly established in the case of a total loss, that whatever remains of the vessel in the shape of salvage, or- whatever rights accrue to the owner of the thing insured and lost, they pass to the underwriter the moment he is called upon to satisfy the exigency of the policy, and he does satisfy it.”
(North of England I. S. Ins. Co. v. Armstrong, L. R. 5 Q. B., 244; see also Propeller Monticello v. Mollison, 17 How., 152; Mercantile Marine Ins. Co. v. Clark et al., 118 Mass., 288; Shaw v. United States, 8 C. Cls. R., 488; Dozier v. United States, 9 id., 342.)
As long ago as first Vesey, sr., Lord Hardwicke, in case of an ' illegal seizure, held that the person originally sustaining the *440 loss was tbe owner, but, after satisfaction made to him, the insurer, s¡o chat if compensation be made for the seizure the assured stands as trustee for the insurer in proportion to what he has.paid. (Randal v. Cochran, 1 Ves., sen., 97.)
In one New York case (United Ins. Co. v. Scott, 1 Johns., 106) the court held_ that right of ownership in a captured vessel passed to the underwriters upon'abandonment and payment of total loss; in auother similar case (Robinson v. United Ins. Co., 1 Johns., 592) the insurers were sustained in their endeavor to bring trover against the owners for a cargo captured, abandoned, and paid for, while the case of Gracie held abandonment useless; and in the Chinese indemnity claims this court ruled (Hubbell v. United States, 15 C. Cls. R., 546) that underwriters who had paid losses sustained by reason of the capture and plunder of a vessel and cargo by Chinese pirates could participate in an indemnity fund paid therefor.
In some cases after payment of the insurance the assured executed an instrument, called a cession, in the nature of an assignment, by which they transferred to the insurer all rights to the property, and to any recovery on account of it; but the insurer’s right is not based upon that instrument, as the Supreme Court held in Comegys v. Vasse (1 Peters, 193), where the absence of an assignment was set up against the underwriter. The court said that—
“The law gives to the act of abandonment, when accepted, all the effects which the most accurately drawn assignment would accomplish.”
So Justice Washington held in Hurtin v. The Phoenix Insurance Co. (1 Wash. C. C., 400):
“If a cession, as it is called, had been necessary to make the abandonment complete there might be something in the argument; but this is not the case. The abandonment amounts to a legal transfer of the rights of the insured, so as to enable the underwriters to pursue, to manage, and to recover the property, as effectually as if a regular deed had been made to them. * * * When it comes to be made a question whether the abandonment is invalid, if the cession is refused, we must • say it is not; because such an instrument is not necessary to pass the right of the insured to the underwriters.”
The authorities are entirely united on this point, and there can be no doubt of the validity of claims made by insurers who have paid loss by illegal capture, condemnation, and confisca *441 tion of vessels included in the description of the act of January ■20, 1885.
Remembering that the loss in cases where the vessel has been captured, condemned, and confiscated is a total loss, a “ constructive ” total loss, as it is sometimes called, and that abandonment is, therefore, unnecessary, we have a clear rule for our guidance in determining the amount of compensation •coining to the underwriters. Kent said they were entitled to reimbursement; the Supreme Court that they were entitled to be reimbursed the amount paid; Lord Hardwicke that they ■should recover in proportion to what they paid; the Supreme ■Court, again, “ the insurers are entitled only to damages to be recovered from an injury for which they have paid, and to such proportion only of those damages as the amount insured bears to the valuation in the policies” (The Potomac, 105 U. S. R., 635), “the underlying principle in the whole matter being the contract of insurance, which is one of indemnity,” (ib.), therefore the insurer stands in the place of the insured to this extent, that he can recover indemnity or satisfaction; that is, what he paid under his contract. He has the right to be made whole, but nothing further.
There is no substantial contention as to the fact that the premium received, being part of the interest insured and paid, •constitutes part of the insurer’s loss, .which he is entitled to recover. It is, therefore, unnecessary to discuss this pointfurtlier. •(1 Parsons Mar. Ins., 243; 2 id., 344; 2 Phillips on Ins., § 1221.)
It has also been suggested that the underwriters should sue here in the name of the assured. If this point be well taken it would in effect defeat their claims, as the parties are dead, the next of kin and devisees are scattered, and to require each one to be found, or to require administration to be raised upon the •estate of each of the original parties for use merely in fulfillment of some strictly technical requirement of the common law, which has no substantial value in the administration of this act, and does not tend to the protection either of claimants or of the Government, would be to defeat the very purpose of the legislature. The Congress requires us to examine those valid claims of citizens of the United States which they had prior to a certain date; that is, claims then valid against France. Underwriters who had fulfilled their contracts had such claims which would then undoubtedly have been recognized by the *442 President, by Congress, and by France, without the intervention of the assured as mere figure-heads. We are also to find the present ownership; that is, the ownership in fact, the party entitled to receive the money should payment be made; the beneficiary of what Kent called the trust in the Government. Congress also, in case of assignment, requires the name of the assignee, the date of the assignment, and the consideration therefor. To hold that a distinction is to be made between what are termed equitable rights, as in this case, and technical common-law rights, might require us possibly to force the as-signee to sue under the old rule in the name of his assignor, a construction manifestly not permitted by the language of the remedial statute.
We do not understand that we are to act as a court of common law under this act, which gives us simply advisory powers. So far as possible we shall follow the principles and doctrines of that law as affording a safe and proper guide, but it will be, doubtless, necessary, under these very peculiar circumstances, to depart from those principles and doctrines where an enforcement of their requirements, especially those technical in their nature, would result in substantial denial of justice. In the Chinese indemnity cases, under an act much stricter in its provisions thau this is, we held the jurisdiction to be of an extraordinary nature, not limited and restrained by the ordinary rules applicable in most cases, and we entertained the claims of underwriters presented in their own- names, as we shall do in these cases; therefore we do not examine the argument based upon the origin and nature of an insurer’s rights.
Other points have been advanced in the argument in relation to the rights and equities of insurers, the effect of precedents established by international commissions, the value of the insurable interest, and similar questions, which it does not seem to us need be ruled upon in this preliminary discussion; what we have indicated herein as our opinion upon the general questions at issue will, we believe, afford a sufficient guide to parties tor the present in the preparation of cases for trial.
The Government moves to strike out certain evidence as inadmissible, a motion which would be immediately granted were the case within the ordinary jurisdiction of the court; but the statute makes a material change in the law of evidence when it directs us to receive all suitable testimony, on oath or *443 affirmation, and all other proper evidence, historic and documentary, concerning the claims. The construction of the word “suitable,” as applied to testimony, and “proper,” as qualifying evidence, may become of very serious importance hereafter. In this case, however, claimants urge that they have sufficient evidence without that objected to, and upon settlement of the facts we shall have, perhaps, occasion to verify that position, meantime it is impossible in advance to indicate any general rule as to the “ proper” historic and documentary evidence, or as to the “ suitable” testimony which may be received and considered.
Each claim and each document will probably present a different question. As to an ancient document, for example, the absence of suspicious circumstances surrounding it, the evidence of genuineness contained in it, its history, and its appearance, may all become important, and can only be settled by an examination of the paper itself with its antecedents and the circumstances peculiar to it. Nor is a general rule of evidence necessary to be announced in advance for the protection of either party’s rights, as it is to be assumed that each side will in any event in cases of this nature produce all the evidence attainable.
The motion to strike out is denied without prejudice to defendants’ right to renew it at the trial on the merits. The demurrer is overruled.
Weldon, J., sat at the hearing of these cases, but was prevented by illness from taking part in the decision.