Drake, Ch. J.,
delivered the opinion of the court:
The first question of law involved in these cases is as to the meaning and intent of the act of Congress under which they *590 are submitted to tlie jurisdiction and tbe decision of tbis court. Owing to the great length of the findings of facts, we will make a condensed reference to the leading circumstances which gave rise to its enactment.
By the convention entered into on the 8th of November, 1858, between the United States and the Emperor of China, set forth in the findings, the sum of 500,000 taels, equal to about $750,000, was provided to be paid by China, “in full liquidation of all claims of American citizens [against China] at the various ports at this date.’7
On the 3d of March, 1859, to carry into effect that convention, an act was passed (11 Sat. L., 408) which authorized the appointment of two commissioners as a 11 board in China,” “to receive and examine all claims which may be presented to them under the said convention, according to the provisions of the same, the principles of justice, and international law”; and the commissioners were required by the act to “report to the chief diplomatic officer [of the United States] in China the several awards made by them, to be approved by him”; and thereupon the fund provided by said convention was to be used to pay the awards.
Before this board the claims which are now, in part, before us in these suits, were presented, all growing out of the loss of the bark Caldera, her cargo, and the effects- of her master, through the acts of Chinese pirates in a Chinese port.
The board allowed forty per cent, of the several claims, except that of the master, upon which they took no action, and disallowed the remaining sixty per cent, on the ground that before the perpetration of the acts of piracy through which the vessel and her contents were lost, both vessel and cargo had been damaged to the extent of sixty per cent, by perils of the sea.
The parties received in China the forty per cent, allowed them, with interest thereon.
If the matter had ended here, the action of the board would have been final and conclusive for all time on the subject-matter; and the rejected portion of these claims could not have been again brought under review in any judicial tribunal. (Comegys v. Vasse, 1. Pet., 193.)
But the claimants appealed to Congress for relief, and that body, with a full knowledge of all the facts in relation to these claims, and of all that had passed between the Government of *591 tlie United States and that of Cbina in regard to them, saw fit to pass tlie following act:
“AN ACT supplementary to tlie act entitled ‘An act to carry into effect tlie convention Between tlie United States and Cliina, concluded on tlie eig'litli day of November, 1858, at Shanghai,’ approved Marcli 3, 1859, and to give to the Court of Claims jurisdiction in certain cases.
11 Be it enacted by the Senate'and Souse of Representatives of the United States of America in Congress assembled, That any person or persons, or body corporate, holding and making any claim upon the balance of the fund usually designated and known as “the Chinese indemnity fund,” under the control of the Department of State of the United States, and now unappropriated, for loss sustained by the plunder and destruction, in the year 1854, of the bark Caldera, and property on board of said vessel, may, at any time within twelve months after the passage of this act, commence proceedings in the United States Court of Claims against the United States, in the same manner as other suits are brought, pursuant to and in virtue of the statutes of the United States and the rules of said court: and that the said Court of Claims shall have full jurisdiction to" hear and determine such claim or demand, according to the principles of justice and international law.
Sec. 2. That at the hearing or on the trial of any suit so commenced, either party, plaintiff or defendant, shall have the right to use before the court any testimony or documents which may be relevant to, and competent upon, the issues joined between the parties ,• and that the proceedings, trial, decision, and judgment of the said court shall be had in the same manner as in all other cases before the said Court of Claims, and have the same effect; and that either party, plaintiff or defendant, may appeal from the decision or judgment of the said Court of Claims to the Supreme Court of the United States in the same manner as now provided for in other cases: Provided, however, That if any final judgment be found in favor of a claimant or plaintiff the same shall only be paid and satisfied out of the balance of said Chinese indemnity fund; and if said judgment shall be in favor of the defendant, then such claimants shall be forever barred, in law and equity, from hereafter making any claim upon or against said fund.
“Approved June 19,1878.”
Under this act these suits were instituted, and by its terms their decision is to be governed.
The right of these parties under this act to present their claims for adjudication here is not questioned by the defendants, except as to Henry W. Hubbell, who claims as assignee. As to him, it is urged that the assignment under which he claims, executed *592 on the 19fch of July, 1858, was null and void under tbe provisions of the act of February 26, 1853 (10 Stat. L., 170), which declared “ that all transfers and assignments hereafter made oí any claim upon the United States, or any part or share thereof, or interest therein, whether absolute or conditional, * * * shall be absolutely null and void, unless the same shall be freely made and executed in the presence of at least two attesting witnesses, after the allowance of such claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof.”
To this position the simple and conclusive answer is that' these are not claims against the United States, but against the Empire of China, represented by ‘“the Chinese indemnity fund,’ under the control of the Department of State.” That statute, therefore, has no application here.
What could be brought here for our adjudication under the act1? “ Any claim” which “any person or body corporate,” being an American citizen, might see fit to make, within twelve months after the passage of the act, “upon the balance of the fund,” “for loss sustained by the plunder and destruction * * * of the bark Caldera.”
These comprehensive terms, taken in connection with the fact that it was well known to Congress, when it passed the act, that all the claims now sued on had been before the board, and that forty per cent, of them had been allowed and paid, and sixty per cent, disallowed, lead us to the conclusion that it was the intention of Congress to grant these claimants a rehearing before this court as to the disallowed sixty per cent.; for otherwise the act refers nothing whatever to us.
In the decision of the question whether the claimants are entitled to that part of their claims, we are first to ascertain whether a rule is laid down in the act for our guidance, and we find that there is. We are authorized to “ hear and determine according to the principles of justice and international law'1 any claim brought before us. This is in terms the same rule that was prescribed by the act under which the “board in China” was appointed; except that in that act the commissioners were required to examine claims “according to the provisions of the convention, the principles of justice, and international law.” The omission from the present act of any reference to “the pro *593 visions of tbe convention” is not considered to have any effect upon tbe rights of these parties.
Whether, “ according to international law,” the claimants had, in the first instance, valid claims against China for the loss and destruction of the Caldera, we do not consider to be now an open question as between the United States and these claimants.
By direction of the President, the Secretary of State, on the 5th of October, 1855, instructed the United States Minister in China to bring those claims to the serious attention of the Chinese Government, and to demand a pecuniary compensation equal to the actual loss of our citizens. He characterized it as “clearly a case of aggravated wrong”; and held that “the proofs make out a claim against the Chinese Government”; not, let it be observed, because a treaty had been violated, but even “though it might not come under any specific provision of the treaty.” To every intent this must be considered as asserting a demand which the President regarded as sustained by international law, quite independently of treaty stipulations. So regarding it, he used this emphatic and, in diplomacy, unusually energetic language: “That government should be made to understand distinctly that it is regarded by your government as a serious affair, and it is expected that the demand for indemnity will not be evaded or long delayed.”
The United States have not to this day changed the attitude then taken in regard to these claims. On principles of international law they then held China liable to make indemnity to these parties. China paid $750,000 “in full liquidation of all claims of American citizens” up to November 8,1858, specifying none, but paying a gross sum, 'which the United States received, and undertook to ascertain, determine, and satisfy out of that sum “all claims of American citizens” against China which had accrued prior to that date.
It cannot be questioned that, in determining what claims should be paid out of that sum, it was the right of the United States to ascertain, in such way and through such instrumentality as they might see fit to prescribe and employ, whether any claim which had not been presented by the United States to the Chinese Government before the convention of 1858 was a claim for which, by international law, China was liable; but when the President of the United States, before that convention was signed, had examined into claims — as he did in the case *594 of tbe Caldera — and had not only decided that they were just claims against China, but had ordered a peremptory demand to be made upon China for their settlement, the point was set tied, so far as the United States are concerned, that by international law they constituted a legitimate reclamation upon that country. And it was so settled by the only department of the United States Government that had authority to settle it. And in our judgment it is not for any judicial tribunal to assume to reverse that decision of the national Executive, and so put our government in the unjustifiable and unenviable position before the world of having demanded money from China to pay certain claimants, and then denying them indemnity out of that money on the ground that, on principles of international law, they never had any claim whatever against China. It would be inconsistent with the plainest principles of national honor for our government to have urged, in language so peremptory and with a promptness so conspicuous, demands which, as now claimed, were unsanctioned by international law.
But the United States, though nominally the defendants here, are not the real defendants. These suits are, in effect, against China. If the United States can at all deny that these are legitimate claims under the principles of international law, they must do so, if not for China, at least from the Chinese Standpoint-Viewing the matter from that standpoint, we regard the question as equally settled. China, in consequence of the demand of the United States for indemnity for these very claims, as well as others, paid the money constituting the fund, and in all the diplomatic correspondence which preceded the convention there was no objection by China to her liability, by international law, to make the particular indemnity demanded by these claimants. On the contrary, the payment by China of the money, with knowledge of the existence of these claims, is conclusive to us that the Chinese Government recognized her international liability for them, and intended to provide for their satisfaction, at least so far as that could be obtained from that fund. Therefore, whether the United States speak now for themselves or quasi for China, it is not competent for them to deny the original liability of China, by international law, for the loss and destruction of the Caldera.
But, further, we refer to the action of the board appointed by the United States. That body was required to examine claims *595 “according to tbe principles of international law”; and the United States declared, by the law under which it was appointed,, that its decision on all claims brought before it should be final. In every case presen ted to it the initial and fundamental question was whether, according to international law, the claim was a legitimate one against China. That question the board decided in favor of each of the claims, of which those now before us were a part, except that of Captain Rooney;, and we are satisfied that it would have allowed them in their entirety, if the commissioners had not, upon what they regarded as sufficient evidence, deemed it their duty to disallow sixty per cent, of them, because of damage by perils of the sea, sustained before the loss and destruction of the Caldera by the pirates.
Therefore, by the diplomatic act of the United States, by that- of China, and by the action of the board, we consider the original liability of China, according to international law, for the Caldera claims, a point settled, and not now re-examinable here.
But the act under which we are now proceeding seems to us, in itself, when considered in connection with all the circumstances, to be a recognition of the validity, under international law, of those claims. As before suggested, that act was passed with full knowledge on the part of Congress of every fact which ever transpired in regard to them. The diplomatic correspondence about them, the positions respectively taken by our government and that of China concerning them, the action of the board, all were as well known to Congress when it passed the act as they are to us to-day; and is it at all supposable that that body could not see as clearly as the President did in 1855 that the claims of these parties were, according to international law, legitimate claims against China? And if Congress had not so considered them, is it conceivable that the door of this court would have been opened for their presentation here ?
It is no answer to this to point to the words of the statute requiring us to hear and determine these claims “ according to international law.” That was but a continuance, in terms, of the rule of decision prescribed by the act of 1859. In view of the possibility of new claims being presented, on account of the Caldera’s destruction, which had not been brought before the ■ board, it was eminently proper that every such claim should be subjected to the same rule of decision that had been applied *596 to those upon which the board had previously passed. But' it could not be supposed necessary to apply that test a second time to the claims which the board had allowed in part; for that partial allowance was as clear a determination of the original liability of China as if the whole amount demanded had been allowed.
So, in any and every view of the matter, it seems to us beyond reasonable doubt that the question of the original liability of China on account of the destruction of the Caldera has been every way decided against China by both the executive and legislative departments of our government, and, as to claims partially allowed by the board, cannot be now raised in this court. We are, therefore, required by the statute to decide these cases simply “ according to the principles of justice.”
In regard to the merits of the several claims, no extended remark is necessary. The matter is brought down to two simple points — 1. What was the value of the Caldera, her cargo, and the effects of her captain, when she sailed from Hong-Kong ? 2. What damage had the vessel and her contents sustained by perils of the sea before she was assailed by the pirates ?
These points are settled, so far as concerns the value of the vessel and her cargo, by the court’s finding XXXII, in the following words:
“ The value of the cargo of the Caldera, on leaving Hong-Kong, was as represented in the claims made before the said commissioners; and it appears that damage was sustained by said cargo and by said vessel from perils of the sea before the piratical acts aforesaid; but the amount of such damage has not been established by either party.”
Whether the evidence warranted that finding is not now open for discussion here. In Calhoun’s Case (14 C. Cls. R., 193), after careful consideration, the unanimous view of the court as to the finality of our findings of fact was thus expressed : “In deciding a case we first act as judges, in order to determine what evidence shall be received and what rejected. Next, as jurors, we shape the facts into a form resembling a special verdict. The concessions which individual judges make or find themselves unable to make to reach a result are lost in this proceeding. The bar and the world only know that at least three members of the court concur in what is announced as a finding of fact, and have no right to know more unless infor *597 mation is voluntarily communicated.” And in United States v. Adams (6 Wall., 101) the Supreme Court refused to go behind the findings of fact of this court, and declared that the very intent of their rule requiring such findings to be made was that they should be conclusive as to the facts found.
The fundamental points of the value of the vessel and cargo being thus disatinctly found by the court, and the damage thereto not having been established, we consider it u according to the principles of justice” to allow the several claimants the full amount of the sixty per cent, of their claims, which the “ board in China” disallowed.
The same allowance is made in favor of the administrator of Matthew Eooney, the master of the Caldera, for goods and personal effects belonging to his intestate, which were on the vessel, were lost on her, and were uninsured.
The claimants ask interest on their claims; and Judge Hunt concurs with the writer of this opinion in holding that, inasmuch as the deduction of sixty per cent, by the board was unwarranted in law and in fact, that portion of their claims was due to the claimants from the date of the approval of the board’s awards by the American Minister in China, namely, January 2G, 1860 ; and that, as the fund, while in China, earned five per cent, per annum, and since its transfer to the Department of State has earned more than that rate per annum, it is “ according to the principles of justice” to allow the claimants interest at that rate from that date. Judge Nott, in order that the question of interest may be fairly presented by the record in the event of an appeal, concurs in its allowance, but is of the opinion that Congress, having expressly allowed interest in the case of the Neva (15 Stat. L., 440), and not having allowed it in the case of the Caldera, and the money having been in no sense owing to the parties, no interest was intended by Congress to be allowed.
The judgment of the court is, that the several parties recover the sum of sixty per cent, disallowed by the commissioners, with five per cent, interest thereon from January 26, 1860, to the present day, as follows:
No. 11,968. Henry W. Hubbell.$8,507 02
Interest.8, 661 80
Total. 17,168 82
*598 No. 11,969. Henry W. Hubbell.. . $14, 122 91
Interest. • 14, 379 93
Total.. 20, 982
No. 11,970. The Sun Mutual Insurance Co 05 21,363 80
Interest. 42,345 85
11,971. 959 18
The China Mutual Insurance Co Interest. Total 976 63
No. 1,935 81
11,975. 6,584 54
John C. Wilber, administrator .. Interest.-. Total. 6, 704
No. 34 1,3288 88
12,058. 2,850 00
John P. Paulinson, administrator- Tn+Arpst. .. 2,901 85000
.__ ....... 28,502 90 2,901 85
Total. 5,751 85