Howry, Judge,
delivered the opinion of the court:
The record presents a new question. Its novelty demands a full exposition of the court’s views. The demand is for the value of a vessel and its freight and arises under the act known by the generic name of French Spoliation Claims, 23 Stats., 283.
The brig Betsey sailed from Edenton, N. C., bound for the Swedish island of St. Bartholomew. She did not proceed to her port of destination but went to Antigua, an island possession of the British. There she took on rum (how much does not appear), and, receiving French prisoners, sailed in the direction of St. Bartholomew. Whilst pursuing her voyage the brig was seized by a privateer and subsequently condemned by the French tribunal of prizes at Guadeloupe on the ground that in taking on the rum at Antigua a change of destination was established and that in departing from *128 Antigua she had French prisoners and was apparently carrying them to St. Bartholomew which was not a place for the exchange of prisoners.
That much of the decree containing the recital that it was “probable” that the brig was carrying the prisoners to an English port to effect an exchange is more of a conclusion than the statement of a fact. It was a conjectural statement in its nature, necessarily an inference arising on no fact disclosed by anything like evidence, but on the contrary inconsistent with that other recital in the decree that when the vessel was seized she was apparently going to a neutral island. The only reason assigned by the prize court for the belief that the vessel was not going to a place she was apparently sailing for was that St. Bartholomew was not a place for the exchange of prisoners.
The stronger and better conclusions arising out of the recitals of the decree is that the vessel was taking the prisoners either to the neutral port or to some British port other than Antigua in the English interest. The English would hardly have selected an American neutral carrying a domestic cargo and documented for the port of a Swedish neutral to carry prisoners (rather than by one of their own bottoms) for any proper purpose.
Following the conclusions of the prize court, the important fact is established by the decree that there had been a change of destination by the master of the brig and that prisoners were being taken probably to the place whence the vessel sailed — which was not a place of exchange — or to some other port to aid the British. Such conduct on the part of the American was not compatible with the duty of a neutral.
The only competent evidence consists of the register, the manifest, and an abstract of the decree of condemnation. True, the record contains two affidavits. But no finding can be predicated upon these statements because ex parte in character and made not contemporaneous but long subsequent to the occurrences which resulted in the condemnation of the vessel and constituting hearsay matter miscalled testimony. Petitioners’ counsel concede in oral argument that these affidavits are incompetent and can not be accepted as evidence.
*129 But these affidavits appear in the record as part of petitioners’ proof to establish their right to be indemnified. They do not appear to have been waived in the briefs as competent evidence. We advert to this because the matter of the admissibility of such testimony has been officially presented elsewhere by the learned counsel in the present case in Senate Document 964, third session Sixty-second Congress.
In matter thus officially presented for consideration to the legislative branch for use in other cases it is alleged that this court has in effect held that the spoliation act made no change in the common-law rules of evidence, and that the court has excluded sworn statements made, respectively, 22 and 40 years after the losses, though by persons having knowledge thereof because such statements were not contemporaneous with the occurrences. The leading cases of the ship Parkman, 35 C. Cls. R., 408, the brig Juno, 36 Ib., 239, and brig Maria, 39 Ib., 39, are cited in this executive document as stating a stringent rule because it is said that the common law nowhere requires that testimony shall be contemporaneous; that is, having a certain nearness of time to the occurrence or transaction in issue.
From this it is argued to the political department of the Government that the testimony of a-witness to his personal knowledge is accepted by the law with just as much readiness even 20 or 40 years after the occurrence as if given immediately afterwards. This is true, and nobody doubts its correctness as a legal proposition. But such evidence must be presented by proper legal methods; that is to say, by such methods as will subject both the evidence and the witness to all proper tests. The statement as made on this subject is particularly calculated to mislead. It probably was not intended to mislead but goes too far in that direction to remain unnoticed.
When the vessel of a neutral is condemned by the proper tribunal of a belligerent nation at war with another the law of prize requires the officers of the neutral to protest as soon as practicable under oath. Such contemporaneous affidavits are required for the benefit of the owners and insurers and have been given every consideration in this court.
*130 In no case has the court refused to consider competent testimony of witnesses based upon personal knowledge. Ex parte affidavits disclosing on their face something that the affiant has heard are not evidence and never have been accepted as such except where some statute has provided that statements like these shall be received in evidence and given such weight as the trial court shall see fit to extend.
In none of the cases cited in this executive document has this court rejected “evidence” under the rules of law pertaining to prize proceedings made upon clear personal knowledge. On the contrary, the court has received and continues to receive “all suitable testimony on oath or affirmation and all other proper evidence, historic or documentary,” following strictly the language of the jurisdictional act and the established rules of evidence generally recognized by courts in maritime or prize cases.
In the Parkman a memorial filed with the commissioners under the Spanish treaty of 1819 was held to be a mere statement of claimant’s case; was never evidence and did not become so by the lapse of time. Speaking for the court, Weldon, J., said, “Proper evidence, historic or documentary,” as used in the jurisdictional act, “does not establish a new principle in the law of evidence.”
In the Juno, Howry, J., speaking for the court, said, “No one of the persons qualifying * * * professes to have any personal knowledge of the capture or of the illegality of the alleged acts,” and in rejecting a newspaper statement the writer sustained the ruling of the Court of Claims by the Supreme Court rule (19 How., 130) that the admissibility of ancient writings embraced no instrument not valid upon its face without proof.
In the Maria, Howry, J., also speaking for the court, said that the person making the affidavit there presented was not present when the ship was seized and condemned and that there was nothing on the face of the affidavit or otherwise showing that the affiant had any personal knowledge of the subject matter.
The large number of spoliation awards made by this court and heretofore appropriated for does not establish the correctness of the prophecy in the early case of the Ganges, 25 *131 0. Cls. R., 110, that "if the common-law rules of evidence were applied with technical strictness it would not be possible to investigate these claims in the spirit contemplated in the jurisdictional statute.”
The jurisdictional direction not only requires evidence, but "proper evidence.” All such evidence means that presented under the system which provides for the determination of rights under rules established by law and recognized by courts. The rule of a commission in the hearing of diplomatic claims where the proceedings are carried on without regard for the rules of evidence as received in courts neither embraces the technical nor excludes anything which the ordinary commission is willing to hear. In this respect a commission is not unlike a legislative committee, where ex parte statements usually constitute the exclusive facts relating to the subject or acts under investigation.
Because spoliation claims are old no reason exists why, when the illegal character of the seizure and condemnation is proven by competent testimony measured by the rules pertaining to prize procedures, they should not be paid. On the other hand, when a disinterested court refuses to predicate a finding on some papers (although hearing a departmental file mark), rejects memorials, affidavits, and other ex parte statements made so long after the actual occurrence as not to constitute a part of the res gestae, it is not apparent to the court why an independent appeal for relief against the court’s decisions should be made to a political body by any private interest. Minds have differed as to whether the act providing for spoliation claims made a material change in the law of evidence. But whatever the difference, it can not now be said that the jurisdictional act made such material change respecting the admissibility of testimony sufficient to make admissible statements not sanctioned by usage and custom in prize courts in connection with that system of law which governs the courts of this country in the determination of rights. The case of the ParTcman was designed to correct any inferences resulting from the statements arising on demurrer in the Delight, 21 C. Cls. R., 434, and in the Industry, 22 ib., 1, where, in one of these cases, a motion to reject testimony appeared respecting changes in the law of evidence as applicable to this class of cases. And in the *132 Nantasket, 46 C. Cls., 297, it was declared that the court had uniformly admitted as evidence protests made after captures if made nearly contemporaneous with the transaction for whatever such protests might be worth as a part of the res gestae; but that where protests were delayed beyond a reasonable time and without satisfactory explanation they should be disregarded like other subsequent affidavits in such cases. The reason is apparent, because without cross-examination or the opportunity for cross-examination ex parte statements are not admissible without statutory command. It ought to go without saying that when carelessly received almost any kind of a case can be established by statements of a hearsay character.
Chief Justice Marshall declared that hearsay testimony supposes some better testimony which may be adduced, but that is not the sole ground of its exclusion. Its intrinsic weakness, its incompetency to satisfy the mind of the existence of the fact, and the frauds which may be practiced under its cover combine to support the rule that hearsay evidence is totally inadmissible. Mimi Queen v. Hepburn, 7 Cranch, 297.
It is argued for claimants in the present cause that defendants have given to the condemned vessel the character of a cartel ship and yet deny that the neutral was that kind of a vessel. We do not so understand the argument. It is expressly stated by defendants that this vessel could not be regarded as a cartel vessel. But no matter what was said in argument, the fact remains that this neutral was not a cartel ship; and because it was not, the unneutral conduct of the vessel more clearly appears. What is a cartel in warfare of the nations ? An agreement between belligerents for the exchange of prisoners. What is a cartel ship except a vessel of belligerents duly commissioned for the carriage by. sea of exchanged prisoners from enemy country to their own country or for the carriage of official communications to and from enemies? There is nothing in this record to justify a finding that there was any kind of an agreement between the belligerents for this American neutral to take on the character of a cartel ship. There is nothing to show that the French authorities had knowledge of anything that the ship was doing until it was captured in jlagrmte delicto. It was a *133 tortious act on tbe part of tbe neutral to transfer from tbe lawful custody of tbe Engbsh tbe prisoners taken by them from tbe French. Tbe plea tbat tbe neutral was performing merely an act of humanity in shipping tbe prisoners affords no answer in tbe absence of some proof of due emergency tbat it was a violation of tbe laws of war between nations for a neutral to take under tbe protection of its flag prisoners of war from one of tbe belbgerents without the knowledge and sanction of tbe other, and then to undertake to carry them to some unknown destination, even though it might be a neutral port. In tbe case of tbe Venus, 4 C. Rob., 358, Sir William Scott declared tbat in war cartel ships were subject to tbe double obbgation (due to both countries) not to trade, because to engage in trade might be disadvantageous to tbe enemy or to their own country; and hence all trade was prohibited by cartel ships.
Tbe plea tbat a neutral vessel could take on board rum and a lot of prisoners without tbe sanction of one of tbe belbgerents' and not be subject to confiscation when found carrying these prisoners to a destination unknown or to a neutral port presents as much a case óf fraudulent intercourse as if tbe neutral was a commissioned cartel ship trading with or serving one of tbe belbgerents to tbe possible injury of tbe other. Tbe claim for indemnity must consequently be denied.
Tbe findings and conclusions, together with a copy of this opinion, will be transmitted to Congress.